Mr. Joyce? May it please the Court. My name is Patrick Joyce. I represent Curtis Murphy, who is the accountant from Spadak. I'd like to start by saying it's very wonderful to see you all present, of course, on the screen today. Thank you. Joyce Curtis is the name of the foundational witness who testified for the government in the trial against Mr. Murphy. It was he alone who connected Mr. Murphy tangentially to this group called the Boss Gang Crew. And more importantly, he alone supplied anecdotal evidence about the total weight that both the group and, as I have noticed, Mr. Murphy should be attributed with in terms of the weight that was disastrously heavily distributed in terms of the conspiracy. On June 25th of 2021, in the district court, the same district court judge whose evidentiary rulings had been challenged, the same district court judge who is being challenged here, sentenced the boss of the Boss Gang. He said some high-strung words. And at that proceeding, on several occasions, the district court judge struck from the record, struck from the PSR, any facts that had been alleged by Maurice Curtis. Why is that important in this case? There are two very specific reasons. First, prior to trial, the defense endeavored to cross-examine Mr. Curtis on a 2010 charge where he was charged with both rape and kidnapping. The district court prohibited us from cross-examining him. More importantly, what we really wanted to cross-examine Mr. Curtis on was the fact that he lied to the government when he spoke to them about what happened, because there was record evidence from the appellate court in North Carolina that two individuals, including Mr. Curtis, forced a young woman in the house, forced her upstairs. Well, how is that, Mr. Joyce, how is that record evidence of what actually happened? Isn't that an appellate court taking the evidence at a trial of somebody else in the light most of that case recited statements of fact? That may not be a fact at all. Mr. Curtis was not present at the trial from which that appeal was taken. He was not a party. No one in that trial underlying that appellate judgment had any incentive to question whether what the facts were as to Mr. Curtis. If anything, the defendant in that case had a motive to blame Curtis. The government had no, the prosecution had no reason to question what any witness said about Curtis. So why do we take, why is that a fact that we just have to take as true? Well, Judge, what was interesting about the writing by the appellate court is that it specifically mentions two individuals. It doesn't just say one. It speaks about both of those individuals. And while the court may not take it as a fact, it was important for the jury to, I think, to understand and to assess the credibility of this program. But I understand why that is. I mean, isn't this, you know, to call it hearsay is almost an exaggeration of its value. It's not the finding of fact by anyone that that is what happened. Mr. Curtis's story, on the other hand, is somewhat consistent with the fact that he was sentenced to probation. His story is, yeah, I was guilty, but I was only an aider and a better. And that's what he told the government. And he told it to the government before the government even knew anything about this sealed, records-desperate case. So why is it? I mean, I could understand your point more clearly if this had been a judgment of conviction of Mr. Curtis, where he was being impeached with, you told this to the government, you told the government you weren't guilty of anything, and here's a court found you guilty. Well, Judge, he did say to the government, basically, I just stood by. She went in consensually. The appellate court found that that was absolutely not true at all, that she did not go in consensually. But even more importantly, as to Mr. Curtis, we know he's a liar, Judge, because we know about the post-testimony where he basically went to the government and signed out the data saying that he had the new information that was just filed against him. But what's interesting about that is that when he pled guilty in front of the district court in that case, when asked about what he did, again, Mr. Curtis stepped back and said, oh, I couldn't read very well. I was having trouble reading. But the district court found one exception. That's because what he did is he worked really hard to exercise so he could stop reading. My point, Judge, is that I don't believe, we don't believe that the government can show proof beyond a reasonable doubt that if the jury deferred that, it wouldn't have affected the verdict, especially to the issue of weight. And we think that weight is most important. Why is that? They heard he had a fraud conviction, so it wasn't as if they hadn't heard that he had a history of dishonesty. But, Your Honor, this level of dishonesty and a specific as to the weight issue, most of what Mr. Curtis spoke about at the trial was information that came from other people. But then we get to the point to follow up on what Judge Lynch said to you. I mean, we have a district judge who looked at the record and decided that this did not clearly show the kind of falsity you're arguing for. Now, I'm not suggesting you don't have a plausible argument, but we review the district judge on an evidentiary ruling for abuse of discretion, and I don't know how we find abuse of discretion when the judge quite clearly explained why he didn't accept the argument that was being urged by the defense. I mean, why do you think we would find abuse of discretion here? Your Honor, in this particular case, we believe it was abuse of discretion because the court discounted the facts as we saw and maybe as the court sees as the record evidence. And I want to move on if I could, Your Honor, to the following, because we believe that that is the most important issue in this case. The reality is that there is no record evidence below that could suggest that a reasonable jury could decide on specific evidence and, in fact, Mr. Murphy should be attributed to an excess of 280 grams of crack cocaine. In Pauling, we know exactly what happened. There was a Pauling Low conspiracy and there were other conspiracies. The circuit court found very clearly that Mr. Pauling possessed with the intent to distribute well in excess of 100 grams. But what they specifically looked at is whether or not in the record evidence there was proof beyond a reasonable doubt without speculation. Right, but we look at it now in the light most favorable to the verdict. And the government has done the arithmetic suggesting how they get to 630 grams over six months. Why don't you tell us why we shouldn't find that acceptable? First of all, Judge Estrada, where it came from. It came from Mr. Curtis with just giving out a number. He said three and a half grams a day, and then they multiply that by a certain amount of days. Don't we assume the jury credited that on review now, on sufficiency review? I think under Pauling, Your Honor, the courts should look to see whether or not there was proof beyond a reasonable doubt. It's a specific element, and the test is whether or not Mr. Murphy participated in specific transactions or whether or not he knew of the transactions or could have reasonably foreseen them. There is nothing in this record that suggests that Mr. Murphy could have reasonably foreseen, for example, the amount of cocaine that Lloyd Gordon was bringing to the group. Lloyd Gordon was the main supplier to this group, and when he got arrested, Mr. Burgess said, oh, my God, we're done. We're finished. We're over. Well, when Mr. Murphy was placed at 100K, it was graded. No one said, oh, we're finished. We're over. What that group was doing and what that group was doing has no connection to Mr. Murphy except for the amount that he was actually arrested with. Now, what we know about when people spoke in – I've got to stay up over my time. Can I just finish this one quick? Yes, go ahead. What we know is this. When Mr. Murphy was actually arrested, he was arrested with a number of different things, crack cocaine, powder cocaine, marijuana, pills, things of that nature. What the record indicates is some people said, I need to get some things from me or from Murphy. What we don't know, proof that's not proof, we have a reasonable doubt that what we're going to get is crack cocaine. I'll reserve two minutes for development. Thank you. We'll hear from your adversary, Mr. Hellman. My name is Matthew Hellman. I'm an assistant United States attorney for the Southern District of New York, and I represent the United States in this appeal, as I did in the proceedings of this report. I'd like to begin by responding to a point that Mr. Joyce made when he started, just to clarify a piece of the record with respect to the government's cooperating witness at the trial of Maurice Curtis. It is true that in 2021, the cooperating witness's cooperation agreement with the government was terminated by the government. That is because the government learned that during their rotation to the COVID-19 pandemic, Mr. Curtis had engaged in at least one, and likely two, instances of fraudulent conduct. One with respect to a recorded health condition, which Mr. Curtis falsely attributed to COVID-19 while he was in custody. And second, with respect to a payroll protection or an unemployment fraud scheme in which Mr. Curtis had engaged from custody. Necessarily, these two instances were related to the pandemic, which had not begun at the time of the trial. The fraud-related conduct was not conduct that he had started prior to the trial or during the trial. He was not involved with co-conspirators in either of those two events with any of the co-conspirators who were issued in the trial. And his conduct, fraud-related conduct, that is in 2020, in no way implicated his trial testimony. It is a fact that the government ultimately terminated the cooperation agreement, but it bears not on his trial testimony, any avenues of the bill of cross-examination to the defense during the trial, or any credibility determinations that could have been possibly made by the jury. And it certainly does not relate back to the 2009 juvenile rape and kidnapping allegation or the 2010 proceeding which occurred in North Carolina involving Mr. Curtis. And, excuse me, Mr. Joyce said that the trial judge at another sentencing proceeding struck from the pre-sentence report things that Mr. Curtis had said. Did that happen after the government terminated the cooperation agreement or before? I believe it was after – if it was not after, does that make it clear that the government had already represented by that point that it would not be relying on Mr. Curtis' testimony at any of the number of scheduled, then-scheduled, fact-filled hearings to resolve disputed issues with respect to other co-conspirators? But Judge Sullivan made it very clear in his ruling that he was not passing judgment on the witness' trial testimony. In fact, Judge Sullivan in a number of sentencing remarks that he found candidly that the witness was credible and he thought that the jury did also, meaning when the witness testified at the trial. Judge Sullivan had ruled with respect to other defendants in the case that they ought to, in his opinion, have an opportunity to cross-examine Mr. Curtis as to any specific allegations or information that Mr. Curtis had provided to the government on which the government was in turn relying at sentencing for those co-defendants. And that is why the Fatico hearings have been scheduled. The government announced its intention not to call Mr. Curtis, obviating the needs of the Fatico hearings, but Judge Sullivan in turn said that without the opportunity to cross-examine this witness, I'm not going to use that information against or in consideration of the sentencing of any particular case. And one imagines that if the government had called him or if the defendants chose to call him, he would have taken the fifth, once his cooperation agreement was no longer in place. That's correct. So the government discovered Mr. Curtis was perpeting in two stages. The first fraud-related conduct, the government confronted Mr. Curtis about it. He admitted the fraud-related conduct had occurred to the government and entered a plea of guilty to an information filed outside the confines of the cooperation agreement. At the time, the government was unaware of the unemployment protection scheme that Mr. Curtis had months earlier participated in. Upon learning of that, the government again confronted Mr. Curtis, who admitted that he had not disclosed that fraud-related conduct, although he had stopped it. And the government chose to turn in the cooperation agreement at that time. Because Mr. Curtis had not been charged in relation to that fraud-related conduct, which occurred in the Eastern District of Newark, the government assumes that he would have been found. Turning then to the defendant's principal argument about Mr. Curtis' later fraud-related conduct and what it means for the earlier decision, just to be clear, the government's point is that it doesn't affect the judge's earlier decision. It doesn't make Judge Sullivan's decision any less correct than it was at the prior proceeding because that's all information that could have not—could be something that had not happened, could not have been known to Judge Sullivan. But critically, Mr. Joyce argues that there is record evidence proving that Mr. Curtis had lied to the government. There's no such record evidence as the government has put forward. In fact, the government does not believe that Mr. Curtis lied to the government about that conduct. But in any event, at a minimum, Judge Sullivan ruled that it was, at best, unclear. And as a result, probing that issue on cross-examination trial resulted in an unsolvable new trial for the jury, which would not have furthered any of the issues. It certainly would not have meaningfully addressed the question of Mr. Curtis' truthfulness. With respect to the other arguments discussed here today, Pauling, setting aside for a moment Mr. Curtis' testimony, there was significant other evidence entered into the record with respect to Mr. Murphy's involvement in the drug conspiracy, Mr. Murphy's provision of specifically crack cocaine to Tyshawn Curtis, who's one of the leaders of the conspiracy. There were telephone calls, for example, which were played in which multiple times in a single day Mr. Burgess called Mr. Murphy asking for additional drug supplies. Mr. Murphy indicated that he would oblige and would meet up with Mr. Burgess. There were also telephone calls demonstrating the ways in which Mr. Murphy mediated distinct between the conspiracy and rivals in the neighborhood. Instances in those calls in which Mr. Murphy discussed members of the conspiracy party themselves in the event that one of the rival groups came and intended to engage in acts of violence with the group. Calls in which Mr. Murphy made clear that he maintained one of his supplies for packaging, preparing, and distributing drugs at the stash house used by Mr. Burgess and other members of the conspiracy, that is so-called Fronti's Crib. Telephone calls which revealed Mr. Murphy's prior control of the Takeda Avenue stash house where Mr. Robinson and other members of the conspiracy worked for Mr. Murphy. Before your time runs out, could you just briefly address the weight issue, how Mr. Murphy could reasonably have foreseen the 280 grams of crack were being dealt? Yes, so in addition to the calls which demonstrate Mr. Murphy's participation in the conspiracy and in fact acting as a supplier to one of the principal sellers of the conspiracy, Mr. Burgess, there was unequivocal testimony from Mr. Curtis that on a daily basis Mr. Burgess alone was selling approximately 3.5 grams of crack cocaine, or what is referred to as a heat ball. Mr. Curtis estimated that he himself during the relevant period of Mr. Murphy's participation was selling approximately a heat ball a week. There were also 13 other members of the conspiracy engaged in crack cocaine. Well, yes, but Mr. Hellman, I think the question is not whether the conspirators distributed well in excess of 280 grams. The question is how much of that was reasonably foreseeable to Mr. Murphy. And it seemed to me that you were relying primarily on the inference that as someone who was himself a somewhat significant supplier to the group and played a kind of supervisory role with respect to the other conspirators, he must have known. Is that the basic argument? Is that the inference that you want us to draw? Or is there direct evidence tying Mr. Murphy to particular transactions in excess of the ones that could be directly traced to him? Or are you saying that the ones that could be directly traced to him themselves add up to more than 280 grams? So, Your Honor, there was evidence, for example, that at a given point in time, Mr. Murphy was sporting 50 grams with both the government, arguing his crack cocaine at Monte's Crib. The point that I was trying to make earlier is that as, for example, one of Mr. Burgess' suppliers, Mr. Murphy had direct knowledge of the volumes and quantities that the conspiracy was distributing on a daily basis. For example, in a single day, Mr. Burgess relied on Mr. Murphy for two lead balls within a couple hours of each other to be resupplied. Mr. Murphy had direct involvement in the daily goings-on of the conspiracy and the amounts that were being distributed by conspirators. In addition to seizures that are directly attributed to Mr. Murphy, for example, 16 grams of crack were recovered from Mr. Murphy's stash location, 50 grams, which were identified at Monte's Crib through calls, and the additional crack cocaine, which was recovered from Mr. Murphy. One instance when he entered Brock's courthouse, and in another case, when he was arrested, crack cocaine was recovered from his residence. I see that I am out of time. Thank you, counsel. Mr. Joyce, you have two minutes reserved for rebuttal. Thank you, Your Honor. In Pauling, the court looked to the relational evidence that was introduced, the phone call, the I'll help you out later, I'll do some more work with you, that type of information, and said, well, that might be evidence of a relationship between the two. It doesn't go to the evidence of weight. And what Pauling specifically said is, sure, there's proof beyond a reasonable doubt it has a relationship, but where is the proof beyond a reasonable doubt about the weight? And, Your Honor, you asked about whether or not you owe deference to the jury. Of course you do, but not if that jury is engaged in impermissible speculation. And I would suggest to you, when the specific question was asked of the government, point to the numbers. I mean, in other cases, in Adonis, which the Pauling court reversed, there were bricks of kilos that were seized on several different occasions. In the case of Mr. Murphy, we're talking about 16 grams, 50 grams, nowhere near 280 grams. And in all those conversations, there's never a weight amount, and there's actually not even a specific drug, which is referred to. And again, going back to what was recovered at the time that Mr. Murphy was both arrested and at the time that the Decatur Street residence was raided, there were a number of different items, controlled substances, that were recovered. Pauling specifically suggested this, because in the call in Pauling, there's a phrase where a buyer says, I'll take the same as I got last time. And what the court specifically said is, we don't know what that means. We don't know if the last time came from Moe. We don't know if the last time was this specific drug. And although you might want to draw some type of impermissible inference, and we're talking about an element of the crime, in this case, it would be impermissible. Mr. Murphy asked that this court reverse the judgment and the sentence below. It didn't abandon the disparity argument in terms of sentence. I just didn't get a chance to get to it. Thank you very much. Thank you, counsel. We'll take the case under advisement.